UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
OWENSBORO DIVISION
CIVIL ACTION NO. 4:13cv-00136-JHM

CHERYL ROACH and                                                    PLAINTIFFS
STEPHEN PHILIP ROACH, II

VS.

**MEMORANDUM IN SUPPORT OF
PLAINTIFFS' MOTION TO EXCLUDE UNRELIABLE OPINION
TESTIMONY OF DAVID SHRABERG, M.D.**

LAURA HUGHES; WARNER                                                DEFENDANTS
CHILCOTT SALES (US) LLC;
WARNER CHILCOTT, PLC; and
WHEELS, LT

Plaintiffs, Chery Roach and Stephen Philp Roach II, by counsel, submit this memorandum in support of their motion to exclude unreliable opinion testimony of Dr. David Shraberg regarding Diffuse Tensor Imaging ("DTI"), to strike Dr. Shraberg's Addendum #3 to his written opinions expressed regarding DTI, and to limit the scope of any opinion testimony of Dr. Shraberg offered during the trial of this action to those areas in which he is qualified to render opinions.

## INTRODUCTION

In June 2015 Dr. James Naas and Dr. Eric Goebel referred Cheryl Roach to Dr. Randall Benson, a neurologist in Michigan, who specializes in the treatment of patients with traumatic brain injuries. Mrs. Roach first saw Dr. Benson in July 2015, and continues to see him related to her injuries. Dr. Benson has examined Mrs. Roach, has conducted neurological testing, and has conducted neuro-imaging studies, including Diffusion Tensor Imaging ("DTI") testing, which all demonstrated consistency with the

diagnosis that she suffers from -- a traumatic brain injury, including a diffuse axonal injury in her brain. Upon Mrs. Roach seeing Dr. Benson, Plaintiff identified Dr. Benson, as a treating physician "expert" witness in updated witness disclosures served on January 7, 2016.

Defendants initially disclosed the opinions of their expert neurologist Dr. David Shraberg on November 5, 2014. After reviewing Mrs. Roach's additional medical records, including those of Dr. Benson, Dr. Shraberg supplemented his initial opinions in a written report entitled Addendum #2 and dated September 15, 2015. Attachment 1. Defendants took Dr. Benson's discovery deposition on November 24, 2015.

Dr. Shraberg again supplemented his initial opinions in an Addendum #3 dated December 23, 2015. Attachment 2. Defendants served these supplemental opinions of Dr. Shraberg on December 28, 2015. Plaintiffs' counsel recently deposed Dr. Shraberg regarding his supplemental opinions on February 18, 2016. Dr. Shraberg's supplemental discovery deposition attached as Attachment 3

During his deposition, Dr. Shraberg testified that he did not address the DTI by Dr. Benson in his Addendum #2. He addressed the DTI in his Addendum #3 at Defendants' counsel's request. (Shraberg Depo. II, pp. 104-105)

Referencing the use and function of DTI, Plaintiffs point the Court to their Response to Defendants' Motion to Exclude the Diagnostic Testing ("DTI") and opinion testimony of Dr. Randall Benson. [DN 133] Importantly, Dr. Benson, a board certified neurologist with extensive fellowship training at Mass General Hospital (Harvard's teaching hospital) in conducting and interpreting DTI testing, has committed the majority

of his professional career to functional brain imaging. (Benson depo, pp. 10-11; 12, 14) Dr. Benson's CV is attached as Attachment 4.

The use of DTI testing is widely accepted. A physician must maintain the proper training and credentialing to conduct this testing and to interpret the results of this testing. When asked about the acceptance of DTI as an additional tool to assist in the diagnosis of mild traumatic brain injury, Dr. Benson stated,

> "DTI, as I mentioned, appears in 11,000 publications since 1994. And it has been used and established as a tool for looking at damage to the white matter of the brain. And if I haven't said so already, closed-head injury, traumatic brain injury, is principally a problem of damage to the white matter of the brain. …DTI is, and was, and will continue to be an excellent way to identify abnormalities in the white matter of the brain."

(Benson depo, p. 138)

Further, Dr. Benson sets forth the overwhelming support regarding the use of DTI to assist in the determination of traumatic brain injury, and the importance of a physician having experience in the scientific application of this test to understand and render opinions regarding its use and interpretation. Dr. Benson states:

Q. [Y]ou mentioned there are 11,000 articles published on DTI. Eleven hundred of those being related to traumatic brain injury. And several – well over a hundred of those being related to its use in mild traumatic brain injury; is that correct?

A. Right.

Q. Would the overwhelming body of that literature be supportive of the use of a DTI in determining and assisting…. in the process of determining if one has suffered a traumatic brain injury?

A. So, yes, that is absolutely true.

(Benson depo, p. 140)

3

Dr. Benson also states, "the overwhelming majority of the articles support the ability of DTI to identify abnormalities in the brains of people with mild traumatic brain injury. And even so far as to show correlations between imaging parameters and the severity of memory deficits, or cognitive slowing." (Benson depo pp. 17-18) As to the expertise required to understand and opine on a DTI, Dr. Benson states:

> …I've shown on the record that the DTI is not only abnormal, but that it's abnormal in a way that explains Cheri Roach's deficits…. I don't think that [Dr.Shraberg] is in a position, not being an imaging person, not with any training, as near as I could tell from his Curriculum Vitae, in imaging, he's not in a position to -- to poke holes in -- in the imaging, which certainly does -- certainly does show brain injury.
>
> (Benson depo, p. 137)  (Dr. Shraberg's CV attached as <u>Attachment 5</u>.

## **ANALYSIS OF DR. SHRABERG'S OPINIONS ON DTI**

With respect to DTI, Dr. Shraberg opines that DTI "is a kind of a developing area in MRI studies." (Shraberg Depo. II, p.14:9-11) He further stated:

> So this technology is being developed to try to yield some help in analyzing people with a variety of conditions, from psychiatric conditions, white matter disease due to vascular disease, hardening of the arteries, strokes, people with multiple sclerosis, traumatic train injuries. People may have profound traumatic brain injuries, diffuse axonal atrophy, retrograde. So this is a technology that's being utilized in new research. To my knowledge it's not yet accepted as a diagnostic tool, certainly for mild or minimal traumatic brain injury, people who may not have any. So it's a research tool. I don't believe at the present time it is diagnostic -- part of the diagnostic armamentarium in -- in medicine, neurology, but it has been around now for 12, 15 years. It's continuing to be developed and researched.

4

(Shraberg Depo. II, pp. 15:15 to 16:10)  Finally, he does not believe a DTI "is yet to be accepted as a diagnostic tool alone, and I should specify, a stand-alone tool."

(Shraberg Depo. II, p. 16:22-24)  He also makes the unsubstantiated claim that

> it's very, very, in my opinion, experimental, hypothetical.  It -- it's -- it's acceptable research tool, but to be used stand-alone in the diagnosis in the mild traumatic brain injury or traumatic brain injury, which there's debate if there was one, my opinion would be it's not sound science.

(Shraberg Depo. II, pp. 18:21 to 19:3)

> Dr. Shraberg is incorrect.  DTI is judicially recognized as sound science:
>
> DTI has been accepted within the medical community.  It is regularly used at some hospitals even though it is not the regular standard of care at the average hospital.  (*Id.* at 24.)  Importantly, . . . there are many articles published in peer-reviewed publications that cover the effectiveness of DTI in detecting mild TBI.  All of the factors shown above weigh towards a finding that while DTI is relatively new and developing technology, it is well on its way to gaining general acceptance in the scientivic community as a tool for identifying mild TBI.  Thus, the evidence shows that DTI and analysis of white matter in DTI images are generally accepted for determining mild TBI.

*Ruppel v. Kucanin*, No. 3:08-CV-591, 2011 U.S. Dist. LEXIS 67503, 2011 WL 2470621, *23 (N.D.Ind. June 20, 2011).  Attachment 6.

Dr. Shraberg depends on his misunderstanding in attempts to accuse Dr. Benson of "overinterpretation," "over-reading," and "cherry picking" in regard to Mrs. Roach's DTI without ever reviewing Mrs. Roach's DTI test:

> Q   Have you reviewed the actual DTI that was run?
> A   No.
> Q   So you are not able to give any opinion as to whether the interpretation of the test is accurate or not?
> A   Again, I've already commented on that and my concerns, but I certainly am not going to go any further than that.

5

> Q But you have not reviewed the actual test, and you don't feel like you're qualified to review the actual test?
>
> A I prefer a neuroradiologist look at it; but, again, I've commented as much as I can on it.

(Shraberg Depo. II, pp. 123:22 to 124:10)

Furthermore, Dr. Shraberg admitted he is not qualified to render any opinions on Dr. Benson's DTI of Mrs. Roach's brain in this case. He testified: "Now, I'm not a neuroradiologist, so, you know, I can only look at it as a clinical neurologist/psychiatrist." (Shraberg Depo. II, p. 20) In addition, he has not had any training in neuroradiology nor any certification in regard to using or interpreting a DTI:

> Q Do you have -- you don't have any continuing education that is specifically related to DTIs or the interpretation of DTIs, correct?
>
> A No.
>
> Q Do you have any certifications from any education programs on the subject of DTI?
>
> A No.

(Shraberg Depo. II, pp. 120:18-24)

> Q Have you attended any training seminars on DTI or its use and received certifications from those?
>
> A No.
>
> Q Do you have any certifications related to the use or interpretation of DTI?
>
> A No.
>
> Q Have you made any presentations on DTI?
>
> A No.
>
> Q Are you board certified in neuroradiology?
>
> A No.
>
> Q Are you a member of the American Society of Neuroradiology?
>
> A No.

6

> Q      Have you ever done a fellowship or had fellowship training in neuroimaging?
>
> A      No.

(Shraberg Depo., pp. 121:9-25)

Even as a clinician, Dr. Shraberg does not read radiological images, and he only looks at them after the images have been read by a radiologist. Not only has he never reviewed the DTI at issue, but he never had Ms. Roach's DTI reviewed by a radiologist or a physician.

> Q      You don't read DTIs?
>
> A      I don't read MRIs or CTs. I first defer to the first reader, which is the radiologist. I look at them, but I'm not --
>
> Q      You've read CTs?
>
> A      I've read CTs and MRIs certainly after it's been read by the radiologist.
>
> Q      You're saying you've never read a CT without a radiologist --
>
> A      No. I always get a first read --
>
> Q      -- initially reading it?
>
> A      Yeah. Initially, I usually -- I usually get them after it's been read initially, first reading by the radiologist.

(Shraberg Depo. II, pp. 119:24 to 120:9)

Dr. Shraberg testified that he based his DTI opinions on what he has seen as a clinician. (Shraberg Depo. II, pp. 20, 30, 32) However, Dr. Shraberg testified he has never read a DTI, nor ordered a DTI test be done on a patient in his clinical practice:

> Q      How often or how many times have you ordered a DTI to be run?
>
> A      I don't recall as of recently ordering a DTI. It's hard enough at the University of Kentucky to get an MRI bran scan --
>
> Q      When you say --
>
> A      -- to be honest with you.
>
> Q      When you say recently, are you meaning --

7

| | |
|---|---|
| A | In the last few months, last couple of months when I work over there and see traumatic brain injury cases or differential diagnosis, so I haven't really -- to my knowledge, I can't recall a case in the last couple of months in which a DTI has been ordered or performed. |
| Q | Okay. Let me ask you that question, again, then. How often or how many times have you ordered a DTI to be run? |
| A | I can't recall when I've ordered a DTI. |
| Q | Ever? |
| A | Not that I can recall. I've -- |
| Q | Okay. |
| A | -- had people I've seen who have had DTIs, obviously, but I can't recall specific cases. |
| Q | That you've ever ordered one? |
| A | No. |

(Shraberg Depo. II, pp. 124:11 to 125:11)

Dr. Shraberg is not familiar with FDA approved and recognized clinical guidelines for DTI testing. (Shraberg Depo. II, pp. 122-123) In addition, Dr. Shraberg has not published anything on DTI or its use:

| | |
|---|---|
| Q | Have you written any articles on DTI or its use? |
| A | No. |
| Q | Have you been published on the subject of DTI or its use? |
| A | No. |
| Q | Have you submitted any documents or articles for peer review on this subject? |
| A | No. |

(Shraberg Depo., pp. 120:25 to 121:8)

Dr. Shraberg attempted to render his opinions of the DTI in this case without any experience, knowledge, or training in the field of DTI:

| | |
|---|---|
| Q | Have you ever rendered any opinions on the topic of DTI and/or its use? |

8

> A I can't recall if I've done in any previous instances, no.
>
> Q Okay. Had any previous forensic cases or otherwise?
>
> A I can't recall, no. I don't recall right now, immediately, no.

(Shraberg Depo. II, p. 122:1-8)

Dr. Shraberg also attempted to render his opinions on Ms. Roach's DTI with next to no independent research on the subject of DTI. When asked if he had been engaged in any other independent research in studying DTI outside of the case at bar, Dr. Shraberg testified, "Well, no." (Shraberg Depo. II, p. 33:25) He indicated he became "interested in it" since "basically DTI was mentioned" at a meeting of the American Academy of Neurology he attended "several years ago." (Shraberg Depo. II, pp. 33-34)

In preparation for his opinions relative to this case, Dr. Shraberg spent "probably about four hours" independently researching the issue of the acceptance of DTI as a diagnostic tool for mild traumatic brain injuries. (Shraberg Depo. II, pp. 32-33) He only reviewed a handful of medical articles, most of which Defendants' counsel provided to him. Four of the articles are listed as Plaintiffs' trial exhibits: Exhibit 112 - "The Role of Advanced MR Imaging Findings as Biomarkers of Traumatic Brain Injury" (Shraberg Depo. II, p. 21); Exhibit 113 - "Global White Matter Analysis of DTI is Predictive of Injury Severity in Traumatic Brain Injury" (Shraberg Depo. II, p. 21-22); Exhibit 114 - "Detection of Hemorrahgic and Axonal Pathology of Mild Traumatic Brain Injury Using Advanced MRI" (Shraberg Depo. II, p. 22); and Exhibit 126 - "A Review of Magnetic Resonance Imaging and Diffusion Tensor Imaging Findings in Mild Traumatic Brain Injury" (Shraberg Depo. II, p. 23).

Two other articles, which Defendants' counsel provided Dr. Shraberg for review to inform his opinions on DTIs, were authored by radiologists and are listed on

Defendants' exhibit list for trial as Exhibit 55 - "Diffusion Tensor Imaging in Mild Traumatic Brain Injury Litigation" (Shraberg Depo. II, p. 27) and Exhibit 56 - "Guidelines for the Ethical Use of Neuroimages in Medical Testimony: Report of a Multidisciplinary Consensus Conference" (Shraberg Depo. II, p. 26)

The only two articles Dr. Shraberg claimed he found on his own were: "The Potential for Medicolegal Abuse: Diffusion Tensor Imaging in Traumatic Brain Injury" (Shraberg Depo. II, pp. 27-28) and "Diffusion Tensor Imaging in Psychiatric Disorders" (Shraberg Depo. II, p. 31).

## ARGUMENT

**Dr. Shraberg's is not Qualified by Knowledge, Skill, Training, or Education to Render Opinions Regarding DTI.**

In his Addendum #3 to his written opinions, Dr. Shraberg criticizes Dr. Benson's use, performance, and interpretation of the Quantitative DTI with Fractional Anisotropy test of Mrs. Roach's brain administered on July 29, 2015. Dr. Shraberg's opinions and critiques are not reliable. He is not qualified to render the opinions in his Addendum #3 and the opinions he expressed in his February 18 deposition.

According to Fed. R. Evid. 702:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a)   the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b)   the testimony is based on sufficient facts or data;
>
> (c)   the testimony is the product of reliable principles and methods; and

   (d)  the expert has reliably applied the principles and methods to the facts of the case

In performing its gatekeeping function, the Court examines whether "the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 592 (1993). In *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999), the Supreme Court concluded:

> that *Daubert*'s general principles apply to the expert matters described in Rule 702. The Rule, in respect to all such matters, "establishes a standard of evidentiary reliability." 509 U.S. at 590. It "requires a valid . . . connection to the pertinent inquiry as a precondition to admissibility." 509 U.S. at 592. And where such testimony's factual basis, data, principles, methods, or their application are called sufficiently into question, . . . the trial judge must determine whether the testimony has "a reliable basis in the knowledge and experience of [the relevant] discipline." 509 U.S. at 592.

As his February 18, 2016 deposition reveals, Dr. Shraberg does not possess the knowledge, skill, training, and education to offer opinions on the DTI in this case. His lacks any specialized scientific, technical, or other specialized knowledge that would help the jury understand anything about DTI. He never reviewed the DTI in this case. His opinions are not based on sufficient facts or data. His methods used in arriving at his opinions are significantly flawed. He never conducted any significant independent research on the topic of DTI outside of this case, and the little research he did perform was spoon fed to him through Defendants' counsel.

  The inadmissibility of Dr. Shraberg's opinions is analogous to a case in which the court struck the opinions on a DTI offered by a neuroradiologist in *Wagoner v. Schlumberger Technology Corporation*, No. 07-CV-244-J, 2008 U.S. Dist. LEXIS

11

118764 (D.Wyo. June 20, 2008).  <u>Attachment 7</u>.  The defendants' expert neuroradiologist had training and expertise in performing and interpreting MRIs, but did not have any experience performing or interpreting DTI fibertracking.

> [T]he plaintiff opposes and the Court agrees any testimony from Shalen regarding DTI imaging and his opinions regarding any DTI imaging done concerning Larry Wagoner. It has not been demonstrated that he has any special expertise in this area, and for that reason the Court will limit any testimony from Dr. Shalen with respect to DTI imaging.

*Id.* at *5.  The court granted the plaintiffs' motion to strike the expert's testimony to the extent that it prohibited the expert from testifying about DTI fibertracking imaging.  The court allowed the expert to testify regarding "areas within his undisputed area of expertise."  *Id.* at *7.

Dr. Benson, one of the leading clinicians in the nation for developing and validating a DTI as it relates to head trauma (Benson depo, pp. 15-16), sets forth in his deposition testimony the importance of knowledge and experience in DTI to properly understand and opine on the efficacy and interpretation of these tests.  He states:

> Q.   For a doctor to discuss the use of functional MRIs and DTIs and their use, do you find that it would be helpful if they had any experience in either ordering, reading, interpreting, or having a high degree of expertise for familiarity in this area to be able to render testimony or give opinions about it?
>
> A.   I would think that that's an understatement.  I think you are understating it.  I think if you're going to profess to be an expert, and if you are called in to give expert opinions, I think one requirement is that you -- that you have studied and have some experience with the subject matter that you profess to be expert in. …

(Benson depo 147)

Dr. Benson further indicated, "with that being said, he's not in a position to talk about what I did or didn't do because he didn't do it.  Now, what I can say is that I always

12

perform the DTI analysis the same way. There is no subjectivity to it. The maps are created the same way every time." (Benson depo, p. 148).

Dr. Benson indicates the need of having experience in functional brain imaging for a person or physician to render opinions relating to the testing. "I don't think that [Dr. Shraberg] is in a position, not being an imaging person, not with any training, as near as I could tell from his Curriculum Vitae, in imaging, he's not in a position to -- to poke holes in -- in the imaging, which certainly does -- certainly does show brain injury." (Benson depo, p. 137)

Under Fed. R. Evid. 702 and *Daubert*, the Court must determine if Dr. Shraberg's "knowledge, skill, experience, training, or education" qualifies him to render opinions on the DTI. The Court must also determine if Dr. Shraberg's testimony satisfies the *Daubert* test for reliability. Dr. Shraberg is not a neuroradiologist. Dr. Shraberg has never ordered, read, or conducted a DTI, has no expertise on the use of DTI, no training or certification on DTI, and no qualifications to interpret DTI. Outside of this case, Dr. Shraberg has never researched DTI. Even for this case, defense counsel provided the majority of any medical literature on DTI to Dr. Shraberg, after which he only spent a mere four hours reading the literature. Furthermore, Dr. Shraberg did not even review the actual DTI of Cheryl Roach's brain.

This Court has previously ruled in this case that Dr. Shraberg is not allowed to testify as to subjects on which he is not qualified, i.e., regarding Mrs. Roach's shoulder/brachial plexus injury. Plaintiffs have shown Dr. Shraberg lacks the qualifications to render opinions on DTI, the opinions he has rendered are not reliable,

13

and the Court should exclude any testimony from Dr. Shraberg on the DTI Dr. Benson performed on Mrs. Roach's brain.

WHEREFORE, Plaintiffs respectfully request the Court to enter the tendered Proposed *Order* granting Plaintiffs' motion and excluding Dr. Shraberg's unreliable opinion testimony regarding Diffuse Tensor Imaging, striking Dr. Shraberg's Addendum #3 to his written opinions, and limiting Dr. Shraberg's opinion testimony to those areas in which he is qualified to render opinions.

RESPECTFULLY SUBMITTED,

Christopher L. Roads, Esq.
RHOADS & RHOADS
115 East Second Street, Suite 100
P.O. Box 2023
Owensboro, Kentucky 42302
(270) 683-4600 ● (270) 683-1653 (fax)
chris@rhoadsandrhoads.com

By /s/Christopher L. Rhoads
     Christopher L. Rhoads

and

MOORE, MALONE & SAFREED
104 East Fourth Street
P.O. Box 549
Owensboro, Kentucky 42302-0549
(270) 683-4513 ● (270) 683-4565 (fax)
cemoore@moorelaw.org

By /s/Charles E. Moore
     Charles E. Moore

ATTORNEYS FOR PLAINTIFFS